

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00096-CR

DON CLAYTON COOKSEY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Bowie County, Texas
Trial Court No. 12-F-377-005

Before Morriss, C.J., Moseley and Hill,*JJ.
Memorandum Opinion by Chief Justice Morriss

---

*John G. Hill, Retired Justice, Sitting by Assignment

# MEMORANDUM OPINION

Don Clayton Cooksey was a Texarkana lawyer at the center of this professional tragedy[1]

involving theft, misapplication of fiduciary property, and forgery.  There were many losses along

---

[1]For over thirty-five years, Cooksey was an established civil and criminal defense attorney practicing in Texas and Arkansas who was described by retired District Judge John F. Miller, Jr., as "an excellent advocate."  Cooksey had experienced substance abuse issues early in his career, but he joined Alcoholics Anonymous, recovered from his addiction, and built a thriving law practice.

While Cooksey may have won the battle over the bottle, he appears to have succumbed to a gambling addiction, resulting in devastating losses to both his clients and himself.  At his trial, Jennifer Duke, the compliance risk manager for Horseshoe Bossier City (the Horseshoe), a casino in Bossier City, Louisiana, produced Cooksey's gambling records for the last several years.  The records revealed that, while Cooksey spent very little gambling at the Horseshoe in 2006, he spent at least $89,000.00 playing slot machines there in 2007.  The testimony of Michelle Curtis, the compliance risk manager for Boomtown Casino (Boomtown) in Bossier City, revealed that Cooksey also engaged in heavy gambling at Boomtown in 2007.  Both risk compliance managers testified that the documents showing Cooksey's slot machine expenditures were an underestimate of his total gambling transactions at those casinos.

Cooksey's ex-wife and former secretary, Rita Cooksey, testified to Cooksey's gambling problem.  According to Rita, the problem grew exponentially worse as it infected his practice.  Rita testified that Cooksey's law practice was "in the red, financially."  According to Nancy Durham, Cooksey's secretary from 2005 until 2008, Cooksey stopped working on his clients' cases in 2007.  Kenneth Fields, a former owner of an illegal penny arcade, testified that Cooksey would come into the arcade three or four times a week to gamble.  Fields' employees were instructed by Cooksey to lie to his clients who were searching for him by telling them that he was no longer patronizing the gambling house.  When law enforcement shut down the penny arcade, Fields claimed that Cooksey owed the house $1,300.00.

Whether due to his gambling addiction or not, Cooksey, at some point, began to neglect his law practice; he stopped communicating with his clients, failed to appear in court for scheduled proceedings, missed filing deadlines, and allowed cases to languish to the point that they were dismissed for failure to prosecute.  Naturally, the list of clients angered by Cooksey's neglect quickly grew long.  These displeased clients called Cooksey's law office often seeking information on the status of their cases, explanations for his nonappearances in court, and answers for why their cases had been dismissed for want of prosecution.  Secretaries Durham, Michelle Greenhaw, Erin Ferguson, Stacy Hughes, and Carolyn Johnson were forced to handle these calls and try to offer excuses for Cooksey's inexcusable conduct.

While Cooksey's business was in turmoil and he was on the brink of financial ruin, the unsuspecting victims in this tragedy, his clients, suffered the most.  Client complaints ranged from failure to return telephone calls and failure to appear in court, on one end of the spectrum, to forgery and theft of settlement proceeds, on the other.  The state bar organizations of both Arkansas and Texas received numerous grievances regarding and complaints against Cooksey, prompting both organizations to commence independent, formal investigations.  While these investigations were pending, the local judiciary took notice of Cooksey's behavior.  Nancy Talley, Bowie County Justice of the Peace for Precinct 1, Place 1, testified that she was aware of five clients, including those with claims pending in her court, who asserted that Cooksey was not working on their cases.  Judge Miller testified that Cooksey's absence in court became very noticeable and that he would often fail to notify Miller's court that he was not going to appear on behalf of his clients.  Cooksey would sometimes tell Miller that he was in another court, but Miller was often unable to verify Cooksey's excuses.

Randy Wright, Circuit Judge of Arkansas, 8th Judicial District-North, Division 1, also testified that he routinely experienced problems with Cooksey's attendance, despite the fact that Cooksey had previously been held

2

the way: untold gambling losses, the loss of an aggregated sum of over $200,000.00 to

Cooksey's former clients, the loss of Cooksey's licenses to practice law in both Texas and

in contempt for failure to appear in his court. Wright testified that Cooksey's clients would frequently be in court and would have no idea where Cooksey was or whether he had a conflict that required his attendance elsewhere. Miller and Wright grew suspicious of Cooksey's repeated and unverified excuses. On one occasion, Cooksey represented to Miller that he had to be in Wright's court. Miller excused Cooksey, granted him a continuance, and called Wright to inform him that Cooksey was on his way. Wright testified that Cooksey failed to appear for the hearing.

Cooksey's former colleagues in the Texarkana legal community also began to notice his strange behavior and were concerned for his well-being. James Elliott, a retired Bowie County Assistant District Attorney of thirty-four years, testified that he noticed a change in Cooksey during this time period and that Cooksey's failure to appear in court became routine. Attorney Errol Friedman recalled that, on one occasion, Cooksey appeared at a custody hearing on behalf of a client, requested a several-hour continuance, represented to the trial court that he could appear later that day, prompting the trial court to reschedule the hearing, and then failed to appear even though the parties, opposing counsel, and the judge were all present and waiting for him.

Stark Ligon, Chief Disciplinary Counsel for the Attorney Discipline Office of the Arkansas Supreme Court, investigated several complaints filed by Cooksey's clients. Ligon's investigation ultimately led to the filing of a disciplinary action against Cooksey with the Arkansas Supreme Court. Instead of responding to the allegations raised in this disciplinary action, Cooksey filed a petition to voluntarily surrender his license to practice law in Arkansas September 1, 2009. The Arkansas Supreme Court granted Cooksey's petition November 5, 2009.

Meanwhile, Lisa Holt, Assistant Disciplinary Counsel for the State Bar of Texas, was also investigating another grievance filed against Cooksey with the State Bar of Texas. The results and consequences of Holt's investigation in Texas were strikingly similar to those of Ligon in Arkansas. Concluding that Cooksey had committed misconduct during his representation of a client, Holt filed a formal disciplinary action against Cooksey with the Supreme Court of Texas. Cooksey failed to respond to discovery propounded incident to that disciplinary action, and the Supreme Court made an affirmative finding of misconduct. As a result, Cooksey also submitted a motion to resign his Texas law license. Statewide Compliance Monitor for the State Bar of Texas, Nancy Ashcraft, sent the Texas Supreme Court's Order of Resignation to Cooksey along with a list of instructions.

The Texas Supreme Court required Cooksey to immediately surrender his state bar card and Texas law license, which Cooksey did. He was also required to notify each current client of his resignation and return unearned money and property belonging to them within thirty days of the date of the order. Once this task was completed, Cooksey was ordered to execute an affidavit swearing that he had satisfied all of the requirements the Court had imposed as conditions precedent to Cooksey's voluntary relinquishment of his license. Cooksey failed to comply. Pursuant to the Texas Supreme Court's order, Cooksey was also required to provide written notification of his license relinquishment to all local courts in which he was the attorney of record in a pending matter. Judge Miller testified that he never received Cooksey's required notification.

The State Bar of Texas then turned its attention to Cooksey's former clients who had sought compensation from the State Bar's Client Security Fund (the Fund). Special Administrative Counsel for the State Bar of Texas, Maureen Ray, testified that the Fund was created to provide compensation to clients who could prove either that their attorney had failed to refund an unearned fee or that their attorney had stolen money from them. At the time of Cooksey's trial, Ray testified that she had received fourteen such complaints from Cooksey's clients, that nine clients showed proof of loss and had already been compensated, and that the remaining cases were still under investigation. She revealed that, at the time of her testimony, the Fund had already paid $59,848.00 as reimbursement to Cooksey's clients.

Cooksey's law practice was closed, and he was ultimately indicted for the criminal acts committed against his former clients.

Arkansas, and the loss of Cooksey's personal freedom as a result of the criminal convictions involved in this case. The investigations conducted by the State Bar of Texas and the Arkansas Bar Association led Cooksey to voluntarily relinquish his licenses to practice law in both states. The State of Texas' further inquiry into Cooksey's business practices and client dealings resulted in indictments for theft in an aggregated amount greater than $200,000.00, misapplication of fiduciary property in an aggregated amount greater than $100,000.00, but less than $200,000.00, and four counts of forgery.[2]

On the third day of his bench trial, Cooksey entered pleas of either guilty or *nolo contendere* to, and was subsequently convicted of, all of the State's charges—excepting only paragraph 6 of count 1, a theft allegation that was dismissed. The theft and misapplication charges were aggregated in their respective amounts based on a common pattern of action. For theft, Cooksey was sentenced to ten years' incarceration, ordered to make $203,419.00 in restitution,[3] and ordered to pay a $10,000.00 fine. For misapplication of fiduciary property, Cooksey was sentenced to ten years' incarceration and ordered to pay a $10,000.00 fine. On each count of forgery, Cooksey was sentenced to two years' confinement and ordered to pay a $10,000.00 fine.

Cooksey appeals to this Court urging claims of ineffective assistance of trial counsel, involuntary pleas, insufficient evidence, and clerical errors in the judgments.

---

[2]The charges were lodged in five counts, the first two of which were also broken down into multiple paragraphs. That organization, along with Cooksey's plea to each paragraph and charge, can be seen in the Tables of Charges and Pleas attached as Tables A–C to this opinion.

[3]Though the trial court initially assessed $245,723.00 in restitution, it modified its initial restitution order, lowering the total restitution assessment to $203,419.00.

We modify the trial court's six judgments to accurately reflect Cooksey's pleas to the many counts against him, we further modify the theft judgment to reflect the amount of theft as exceeding $200,000.00 in the aggregate, and we affirm the judgments as modified. That result is dictated by our holdings that (1) Cooksey's pleas and judgments are supported by the evidence, (2) ineffective assistance of counsel was not shown either (a) in the plea process or (b) in how Cooksey's attorneys accepted defense guidance from Cooksey, (3) Cooksey's pleas were knowing, intelligent, and voluntary, (4) sufficient evidence supports the modified restitution order, and (5) the judgments should be modified to accurately reflect Cooksey's pleas and convictions.

*(1)    Cooksey's Pleas and Judgments Are Supported by the Evidence*

Cooksey asserts that there is insufficient evidence against him. We disagree.

In this case, Cooksey was charged with six crimes in six counts, the first two involving multiple victims aggregated based on one scheme or continuing course of conduct. The charges are set out in Tables A–C, Tables of Charges and Pleas, attached to this opinion.

Count 1 of the State's indictment alleged that Cooksey committed theft of property having an aggregate[4] value over $200,000.00. The twenty-five paragraphs of Count 1 named the following former clients as victims: Linda Black, Deborah Boyd, Carl Campbell, Shirley Cook,

---

[4]When amounts are obtained by theft "pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." TEX. PENAL CODE ANN. § 31.09 (West 2011). Thus, "the State need not prove each constituent theft of an aggregated theft allegation pursuant to § 31.09 [of the] Penal Code as long as it demonstrates that enough of the property from the indictment was stolen to satisfy the aggregate value allegation." *Lehman v. State*, 792 S.W.2d 82, 85 (Tex. Crim. App. 1990).

David Davidson, Bridget Wagner,[5] Mark Gibbs, Donald Harris, Lonnie Hickson, Darlene Green, Bobby Irvin, Peggy Little, Chester Kennedy or Sheree Kennedy, Linda King, Glenda Autry, Sybil Kramer, Fredrick Martin, Don Rodden, Mildred Keeth or Deborah Stanley, Patricia Thorp Higgins, Syrr Willborn, Charles Fuller, Shelli Conaway, Kay Henry, and John Marshall.

Count 2 of the State's indictment alleged that Cooksey misappropriated fiduciary[6] property having an aggregate value greater than $100,000.00, but less than $200,000.00. The seven paragraphs of Count 2 named the following seven former clients as victims of Cooksey's misappropriation of fiduciary property: Harris, Hickson, Irvin, Higgins, Willborn, Fuller, and Conaway.

The indictment also contained four separate counts of forgery: Count 3 alleged that Cooksey forged Harris' signature on an otherwise fully executed settlement agreement and release of claims; Count 4 alleged that Cooksey forged Harris' signature on a settlement check; Count 5 alleged that Cooksey forged Hickson's signature on a settlement check; and Count 6 alleged that Cooksey forged Higgins' signature on a settlement check.

The State presented many witnesses who testified that Cooksey had settled cases without their approval, cheated them out of their settlement checks, and taken money in exchange for promises on which he could not deliver. These witnesses also testified that Cooksey failed to

---

[5]The State dismissed the theft paragraph relating to Wagner.

[6]An individual acts in a fiduciary capacity with respect to another's property when the property he handles "is not his or for his own benefit, but for the benefit of another person as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part." *Gonzalez v. State*, 954 S.W.2d 98, 103 (Tex. App.—San Antonio 1997, no pet.) (quoting BLACK'S LAW DICTIONARY 625 (6th ed. 1990)).

return money paid for missed court appearances, money Cooksey was supposed to have been holding in escrow, and unearned retainers. The State argued that the testimony suggested a pattern of behavior establishing criminal intent.

Cooksey argues that, despite his pleas, the evidence was legally insufficient to support the judgment.[7] The State is required to introduce evidence demonstrating the defendant's guilt, and no trial court is authorized to render a conviction in a felony case based on a plea of guilty without sufficient evidence to support the same. TEX. CODE CRIM. PROC. ANN. art. 1.15 (West 2005). "Article 1.15 [b]y its plain terms . . . requires evidence in addition to, and independent of, the plea itself to establish the defendant's guilt." *Baggett v. State*, 342 S.W.3d 172, 174 (Tex. App.—Texarkana 2011, pet. ref'd) (quoting *Menefee v. State*, 287 S.W.3d 9, 13, 15 (Tex. Crim. App. 2009)). A judicial confession alone is usually sufficient to satisfy the requirements of Article 1.15 "so long as it embraces every constituent element of the charged offense." *Menefee*, 287 S.W.3d at 14.

Cooksey argues that his pleas in open court were insufficient to meet Article 1.15 requirements. "A guilty plea, even if the defendant states that he or she is pleading guilty to the charges in the indictment under oath, does not constitute a judicial confession because the defendant is merely entering a plea, 'not confessing to the truth and correctness of the indictment or otherwise providing substance to the plea.'" *Baggett*, 342 S.W.3d at 174 (quoting *Menefee*, 287 S.W.3d at 13, 15). To support his argument, Cooksey cites to this Court's opinion in

---

[7]With respect to Counts 1 and 2, Cooksey mistakenly argues that the State was required to prove each and every paragraph of the indictment. He notes that two of the State's alleged victims did not testify at trial. This argument failed to take into account the aggregated nature of the offenses alleged. *See* TEX. PENAL CODE ANN. §§ 31.09, 32.03 (West 2011).

*Baggett*. *Id.* at 176. There, we held that a trial court's finding of guilt, in response to a defendant's plea of guilty to a simple reading of an indictment, without more, violated Article 1.15 because the plea did not admit the truth and correctness of the indictment. *Id.* Critical to our opinion in that case was the fact that the appellate record in *Baggett* did not contain a stipulation of evidence or judicial confession and was otherwise "devoid of any independent evidence to substantiate Baggett's guilt." *Id.*

While Cooksey's oral plea in court falls short of constituting a judicial confession because it does not admit the truth of the indictment, Cooksey's case is easily distinguishable from *Baggett*. Cooksey also signed waivers and stipulations of evidence before his pleas containing, *inter alia*, the following statements:

> I fully understand the charges against me, the nature of the State's evidence against me, my rights as an accused, and with the advice and consent of an attorney, if applicable, I hereby freely and voluntarily, knowingly and intelligently waive and give up the following rights as a defendant, including:
>
> . . . .
>
> c. CONFRONTATION AND CROSS-EXAMINATION OF WITNESSES, AND STUPULATION OF EVIDENCE: my right to the appearance, confrontation, and right to cross-examine all witnesses. I further agree that all testimony may be orally stated to the Court as if such witnesses were physically present, under oath, and testifying to the Court, and that all documentary evidence may be introduced by stipulation. . . .
>
> Fully understanding the charges against me, the consequences of a guilty plea, and my rights as an accused, and after the consultation with my attorney, I desire to waive and give up those rights and enter a plea of guilty. My decision is not based on any promises or representations not herein-above set out, but I desire to

8

enter a plea of guilty because I am guilty of the offense charged and for no other reason.[8]

These documents referenced the indictment, contained Cooksey's signature, and included the statement, "I desire to enter a plea of guilty because I am guilty of the offense charged and for no other reason." Such a statement is no different than admitting that the allegations of the indictment are true and correct. *See Morris v. State*, 749 S.W.2d 772, 777 (Tex. Crim. App. 1986) ("[W]e have held the evidence sufficient when the accused has confirmed, by sworn testimony or written stipulation, that he had read and understood the indictment and that it was 'true and correct' or that he committed the particular offense alleged therein."); *Dinnery v. State*, 592 S.W.2d 343, 347 (Tex. Crim. App. 1979) (stipulation's incorporation of phrase "as charged in the indictment" is sufficient) (citing *Potts v. State*, 571 S.W.2d 180, 182 (Tex. Crim. App. 1978)). In acknowledging that he is pleading guilty because he is guilty of the offense alleged in the indictment, and for no other reason, Cooksey provided the necessary evidence to support his conviction because the admission encompasses every element of the offense charged. *See Menefee*, 287 S.W.3d at 14; *Stone v. State*, 919 S.W.2d 424, 427 (Tex. Crim. App. 1996); *Potts*, 571 S.W.2d at 182 (judicial confession to offense as charged in the indictment and in-court affirmation of judicial confession constitutes compliance with 1.15).

Cooksey argues that, although signed, the written stipulation was not sworn, and, although presented in open court, Cooksey was not sworn in as a witness at the time he entered his pleas. Article 1.15 provides that the evidence to support a guilty plea and judgment

---

[8]The stipulations also stated "I am satisfied with the representation of my attorney. He provided fully-effective and competent representation for me."

9

may be stipulated if the defendant in such case consents in writing, in open court, to waive the appearance, confrontation, and cross-examination of witnesses, and further consents either to an oral stipulation of the evidence and testimony or to the introduction of testimony by affidavits, written statements of witnesses, and any other documentary evidence in support of the judgment of the court.

TEX. CODE CRIM. PROC. ANN. art. 1.15; *see Menefee*, 287 S.W.3d at 13; *Bryant v. State*, 187 S.W.3d 397 (Tex. Crim. App. 2005). "Evidence offered in support of a guilty plea may take many forms." *Menefee*, 287 S.W.3d at 13. "The statute expressly provides that the defendant may consent to the proffer of evidence in testimonial or documentary form, or to an oral or written stipulation of what the evidence against him would be, without necessarily admitting to its veracity or accuracy." *Id.* As per the language of Article 1.15, there is no legal requirement that an accused swear to a written judicial confession when it is introduced in open court.[9] *Jones*

---

[9]Moreover, almost all of the State's exhibits were admitted by stipulation before the entry of the plea. Before taking testimony, the court noted:

> THE COURT: My understanding is that by stipulation and agreement, a number of state's exhibits, would be found on the exhibit list here.
>
> [State's Attorney]: Yes, that's correct, Your Honor.
>
> THE COURT: That they are being received as evidence without the need for the usual predicate.
>
> [Defense Attorney]: That's correct, judge.
>
> THE COURT: Mr. Cooksey, I assume you're joining with your lawyer in that stipulation.
>
> [Defendant]: I'm following his advice, Your Honor.
>
> THE COURT: Well, okay. I will take it that that's an assent.

*v. State*, 857 S.W.2d 108, 110 (Tex. App.—Corpus Christi 1993, no pet.); *see Ybarra v. State*, 93 S.W.3d 922, 928 n.4 (Tex. App.—Corpus Christi 2002, no pet.).[10]

If the defendant elects to stipulate evidence against himself, "his stipulation is a kind of judicial admission." *Bryant*, 187 S.W.3d at 400. "Judicial admissions are not evidence at all." *Id.* "Rather, they are formal confessions in the pleadings in the case or stipulations by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Id.* Because "[a] fact that is judicially admitted needs no evidence from the party benefitting by the admission," Cooksey's stipulation of evidence "d[id] away with the need for evidence" to be presented by the State. *See id.* By stipulating, Cooksey "waived any right to contest the absence of proof on the stipulated elements." *See id.* at 401; *Houston v. State*, 286 S.W.3d 604, 614 (Tex. App.—Beaumont 2009, pet. ref'd).

Because Cooksey's written waivers and stipulations encompass all of the allegations in the State's indictment, we find the evidence legally sufficient to support the trial court's judgment on each count. In addition to the stipulations, the State presented substantial evidence that also supports the convictions.[11]

---

[10]*See also Jones v. State*, No. 12-05-00373-CR, 2006 WL 3086168. at *2 (Tex. App.—Tyler Nov. 1, 2006, no pet.) (mem. op., not designated for publication); *Thomas v. State*, No. 06-05-00019-CR, 2005 WL 2465703, at *1 n.2 (Tex. App.—Texarkana Oct. 7, 2005, pet. ref'd) (mem. op., not designated for publication); *Ashley v. State*, No. 05-03-01608-CR, 2004 WL 2282148, at *2 (Tex. App.—Dallas Oct. 11, 2004, no pet.) (not designated for publication); *Boyd v. State*, Nos. 14-99-01355-CR, 14-99-01356-CR, 14-99-01357-CR, 2001 WL 619587, at *3 (Tex. App.—Houston [14th Dist.] June 7, 2001, pet. ref'd) (not designated for publication).

[11]Following her son's death in an automobile accident, Higgins hired Cooksey to file and prosecute a lawsuit against the driver of the vehicle with which her son collided. Higgins agreed to pay Cooksey a one-third contingency fee if the case settled. Despite her best efforts—which included numerous telephone calls and frequent personal visits to Cooksey's office—to contact Cooksey for a status report on her lawsuit, Higgins heard nothing from Cooksey for a period of three or four months. Higgins testified that, on more than one occasion when she showed up unannounced at Cooksey's office , Cooksey's secretaries claimed that Cooksey was out of the office, even though Higgins could

see that Cooksey was there. Higgins was eventually informed that two settlement checks, one for $25,000.00 and another for $25,003.00, had arrived, and she went to Cooksey's office to endorse the checks. According to Higgins, Cooksey said the money "had to go into escrow for so many months." He did not give Higgins any indication as to when she would receive her portion of the settlement. Further, after he met with Higgins to facilitate her endorsements of the checks, Cooksey once again became unreachable and uncommunicative. The insurance company that provided automobile coverage for Higgins' son issued a third check to Higgins as its contribution to the settlement of her lawsuit. This $2,503.00 check contained a purported endorsement of her name, but Higgins testified that she had never seen the check, that she did not sign it, and that her name was misspelled on the forged endorsement. In 2012, Higgins testified that she never received any money from the lawsuit settlement even though settlement proceeds checks had been in Cooksey's possession since 2008.

Irvin related a similar account. Irvin hired Cooksey to represent him in a personal injury case and agreed to compensate Cooksey through a twenty-five percent contingency-fee arrangement. After six months of repeated but fruitless efforts to contact Cooksey concerning the lawsuit, Irvin fired Cooksey and retained another firm. A few days after he was fired, Cooksey sent Irvin a letter informing him that the case had settled—without Irvin's input— for $25,000.00. Irvin's insurance company was entitled to $10,000.00 of the settlement funds; neither Irvin nor his insurance company received any money from the settlement.

Through a power of attorney, Harris authorized Penny Shriver to hire Cooksey to represent Harris in a personal injury case. Harris and Shriver testified that, after Cooksey agreed to represent Harris, he essentially disappeared. Cooksey was never in his office when Harris or Shriver tried to contact him, and he was unreachable by telephone; further, Cooksey simply ignored their repeated calls and messages. Three years after he was hired, Cooksey finally contacted Harris and Shriver and conveyed a settlement offer of $3,400.00. Harris told Cooksey he would not accept the offer; with neither the knowledge nor consent of either Harris or Shriver, Cooksey settled Harris' claims for $4,500.00, forged Harris' name on a settlement agreement purportedly waiving Harris' rights and releasing the defendant in the lawsuit from further liability, dismissed Harris' lawsuit, forged Harris' name on the settlement check, cashed the check, and retained the proceeds. The settlement agreement and the settlement check were introduced into evidence at trial, and both contained Harris' forged signature. Harris never received any money from the settlement.

Fuller owned a business that built specialized, metal-fabricated products for the Air Force Reserves and Air National Guard. Fuller's business borrowed $10,000.00 from J.W. Farren to facilitate completion of a government project on which it was working. After completing the job, the company received a $53,000.00 check as compensation. A business dispute arose when Fuller's business associates claimed some ownership of the company's property. Fuller hired Cooksey and paid him a $5,000.00 flat fee to cover both the business dispute and his divorce. Cooksey advised Fuller to deposit the $53,000.00 check into Cooksey's escrow account and represented that he would manage the funds until the claims were resolved. Under the terms establishing the escrow account, withdrawal of funds was only to be permitted upon the agreement of Fuller and his two business associates. Without obtaining the consent of, or even consulting, Fuller or either of his associates, Cooksey wrote a check on the escrow account purporting to repay the $10,000.00 Farren loan from the $53,000.00 Fuller had escrowed. Farren never received the $10,000.00. Farren hired Raymond Wes Jordan to recover the $10,000.00 from Cooksey. To settle the lawsuit filed against Fuller by Farren, Cooksey agreed to pay Farren the money he was due from the loan and agreed to cover Jordan's fees. To satisfy this obligation, Cooksey took another $13,000.00 from Fuller's escrowed funds. In addition to the missing $10,000.00, Fuller testified that he never received the escrow account balance of $13,470.00 because Cooksey told Fuller he was taking the money as an additional attorney's fee.

Willborn hired Cooksey to handle a State's motion to revoke his community supervision in April 2007. Cooksey said the total representation would cost $2,500.00, but allowed Willborn to make a $700.00 down payment and sign a promissory note for the remainder providing for payments in $200.00 monthly installments once the community service violation had been handled. In July 2008, after several unreturned telephone calls placed by Willborn, Cooksey told Willborn that the State would withdraw the motion to revoke and that he would receive no community supervision or jail time if he gave Cooksey $1,681.00, which Cooksey would then pay to the State. Willborn paid Cooksey the money. After the matter continued unresolved, Cooksey told Willborn that the State

12

would not take the money in exchange for withdrawing the motion to revoke, but assured Willborn not to worry. Again, Cooksey failed to respond to Willborn's repeated telephone calls and letters. Seeking answers, Willborn called the district attorney's office. They told Willborn that the State would not want the money, would not drop the motion to revoke even had they received the money, and that Cooksey had made promises to Willborn that could never be kept. Willborn sent his girlfriend to retrieve the money he had paid to Cooksey, but Cooksey would not return it. Willborn was arrested in 2010 and was incarcerated for the community supervision violation alleged in the State's 2007 motion to revoke.

Keeth hired Cooksey in 2007 to file a lawsuit asserting claims of fraud against a car company. Keeth paid Cooksey $2,000.00 and turned the matter over to her daughter, Stanley, who paid Cooksey an additional $1,000.00. Stanley testified that Cooksey would not update her on the status of the case and that she heard Cooksey had voluntarily relinquished his license to practice law in Arkansas. Cooksey told Keeth and Stanley that they would not win in front of the trial court in which their suit was filed because the car company they were suing politically backed the trial judge. Cooksey advised them to file a notice of nonsuit so that he could refile the case in another court, but Keeth and Stanley did not agree to this arrangement. The trial court set the matter for a summary judgment hearing, but Cooksey did not appear at the hearing and did not inform Keeth or Stanley to appear. As a result, the trial court granted summary judgment and assessed $3,500.00 in attorney's fees against Keeth. When Stanley asked Cooksey about the judgment, Cooksey told her he would pay the $3,500.00. In response to Stanley's request for proof of payment, Cooksey sent her a copy of a check which he claimed would be mailed to the opposing counsel's office. Opposing counsel never received Cooksey's check. The $3,500.00 judgment against Keeth had not been paid as of the date of trial.

Donald Wayne Kirby was out on parole when he was arrested on October 25, 2005, for possession of a controlled substance. His mother, Autry, hired Cooksey and paid him $7,500.00 to represent Kirby on the possession charge and to expedite a parole hearing. Tracie Beckett, Unit Supervisor in the Texas Department of Criminal Justice Parole Division in Texarkana, instructed Kirby to have Cooksey contact her to discuss the status of the possession charge because it would impact the parole hearing. Cooksey did not respond to repeated inquiries about the status of the cases. Kirby's wife, Laquita Kirby, testified that she saw Cooksey leave his office once when she went to question him. Beckett testified that she visited Kirby in jail for four months before another parole officer took the case and that Kirby was upset with Cooksey because he had never contacted him. At trial, Beckett testified that Cooksey never contacted her to discuss the cases. Kirby was still in jail on September 12, 2006, when the Bowie County District Attorney's Office wrote, in a letter addressed to Cooksey, that it declined to prosecute the possession charge based on the laboratory results which reflected only a trace amount of a controlled substance. Because this case was dismissed and because it appears that the district attorney's office did not have a file on the possession charge until sometime after July 2006, Cooksey argues that he handled one of the matters Kirby hired him for and that the record is insufficient to support an award of restitution in an amount of $7,500.00.

However, the record indicated that Kirby complained to Beckett during his incarceration that Cooksey failed to visit with Kirby and never brought him paperwork in connection with the possession charge, as previously promised. Early in the representation, Cooksey repeatedly told Laquita that he had filed various motions with the trial court in which the possession charge was pending. Laquita testified that she would follow up on Cooksey's representations, but that the trial court would inform her that nothing had been filed. Thereafter, despite Laquita's repeated inquiries, Cooksey refused to discuss either case with her, even after she had scheduled appointments with him. Laquita testified that Cooksey and his office were unaware that the State had dropped the possession charge. Beckett testified that Cooksey failed to inform her that the possession charge had been dismissed. We find the evidence sufficiently demonstrated that Cooksey rendered no legal services on the possession charge in exchange for Laquita's money.

Marshall testified that he paid Cooksey $2,500.00 to handle his daughter, Melissa Marshall's, criminal case, which was still pending after six years. Melissa testified that the trial court's hearings were repeatedly reset because Cooksey would fail to appear. Cooksey lost his license to practice law while the case was pending. James Elliott, the State's attorney handling Melissa's case, testified that Cooksey never called to discuss the case with him.

13

Hickson testified that he hired Cooksey to represent him in a personal injury case arising from a car accident and agreed to pay him a one-third contingency fee if the case settled. One defendant's insurance company paid the full amount of policy limits. Hickson testified that the proceeds were distributed in accordance with his agreement with Cooksey and that Cooksey retained one-third of the check as his attorney's fee. Hickson believed that Cooksey was next going to collect a settlement from Farmers Insurance Company. He asked Cooksey about the status of this settlement, but did not receive an answer. Yet, Cooksey had already settled with Farmers without Hickson's consent and had received a $50,000.00 settlement check from Farmers before Hickson signed the other company's settlement check. Hickson testified that his signature on the Farmers' settlement check was forged. Hickson also testified that Cooksey continued to tell Hickson he was working on settling with Farmers. Hickson never received any money from the Farmers' settlement.

Several of the victims listed in the State's theft allegations—Black, Boyd, Campbell, Cooks, Davidson, King, Kramer, Rodden, and Henry—testified that they hired Cooksey to represent them, that they paid him a retainer, attorney's fees, or both, that he failed to return their telephone calls or otherwise communicate with them, that he never worked on their case, that, in some instances, he had already lost his license to practice law when he agreed to take on the representation, and that he kept the money they paid him even though he did nothing to earn it and, in some cases, was not licensed to perform the work he had agreed to perform.

Four witnesses testified that Cooksey had done some work on their cases. We discuss each in turn. Martin, who was represented by another local attorney, pled guilty to possession of a controlled substance pursuant to a plea agreement. He was sentenced in accordance with the recommendation contained in the plea agreement, and he was given a few weeks to get his affairs in order before serving the sentence. Following the advice of a friend, Martin called Cooksey to see if anything more could be done in his case. Cooksey told Martin that he would not be required to endure incarceration if he paid Cooksey $6,000.00. Martin paid $3,000.00 immediately. Cooksey appeared in court at the time Martin was scheduled to turn himself in; following the hearing, Cooksey told Martin that he was not able to do anything for him during the hearing. According to Martin, Cooksey then encouraged him to lie to the trial court by stating that his (Martin's) mother was sick. Martin refused to lie to the court and was incarcerated. Martin was unable to reach Cooksey after his incarceration despite numerous telephone calls to Cooksey's office and numerous unfulfilled promises that Cooksey was coming to see him.

Green hired Cooksey to represent her in both a personal injury case and a suit affecting the parent-child relationship (SAPCR). Cooksey asked for a $2,500.00 retainer, accepted a $1,500.00 partial retainer, and allowed Green to pay the remainder pursuant to a payment schedule. Despite Green's telephone calls and office visits, Cooksey refused to communicate with her and failed to update her on the statuses of her respective cases. The trial court set the SAPCR family law matter for final hearing. On the day before the hearing, opposing counsel called Cooksey's office to confirm that Cooksey would be representing Green at the hearing. Green testified that Cooksey called her that same day and advised her not to appear for the hearing falsely claiming that opposing counsel had agreed to continue the hearing. The hearing transcript, however, shows that Cooksey's motion for a continuance was made in the form of a telephone call to the trial court stating that his attendance was required elsewhere. The motion, to the extent it qualified as such, was both opposed and denied. In denying the motion, the trial court noted that no written documentation had been filed indicating that Cooksey was representing Green and that no pleadings seeking affirmative relief had been filed by Green. As a result, the trial court established the parent-child relationship between the child and his presumptive father and gave sole managing conservatorship of the child to his father. Cooksey filed a motion for new trial, assured Green that all would be made right, and continued to accept Green's payments made pursuant to her payment schedule. The motion for new trial was denied. The State introduced copies of checks and receipts that showed that Green actually paid Cooksey a total of $2,250.00.

Gibbs hired Cooksey to counsel and represent him in answering a petition for divorce filed by Gibbs' wife. Cooksey informed Gibbs that his fee for representing Gibbs in the divorce would be $1,500.00, and Gibbs immediately paid Cooksey that amount. After Gibbs made the payment, Cooksey told him that $200.00 would be used to pay a filing fee even though Gibbs' wife had filed the divorce petition. Cooksey prepared a divorce decree that did not comport with the explicit instructions Gibbs gave Cooksey. When Gibbs identified the items in the decree that he wanted modified, Cooksey stated that the changes would be made after Gibbs made another

14

*(2)*     *Ineffective Assistance of Counsel Was Not Shown*

Cooksey argues that his trial counsel, Rick Shumaker and Will Williams from the Bowie County Public Defender's Office, were ineffective in advising him to plead guilty and/or *nolo contendere* in the middle of trial and in failing to allow Cooksey to control or participate in the formulation of his core defensive strategy.

We apply the two-pronged *Strickland* test handed down by the United States Supreme Court to a claim of ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *see Strickland v. Washington*, 466 U.S. 668 (1984). Cooksey bears the burden of proving by a preponderance of the evidence that his counsel was ineffective. *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

The first *Strickland* prong requires a showing that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687; *Riley v. State*, 378 S.W.3d 453, 456 n.5 (Tex. Crim. App. 2012). This requirement can be difficult to meet since there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In fact, "'strategic choices made after thorough investigation of law and facts relevant to plausible

---

$3,500.00 payment. Gibbs did not pay the additional fee, the divorce was not completed, and Cooksey returned none of the money paid to him by Gibbs.

Kennedy testified that he hired Cooksey to represent him after he was arrested for his third and fourth driving while intoxicated charges. Cooksey told Kennedy that the total fee for this representation would be $10,000.00, and Kennedy paid this amount by tendering $8,500.00 in cash and enough jewelry to satisfy the balance. While Cooksey appeared at some hearings in Kennedy's cases, Kennedy testified that he stopped appearing and eventually lost his license to practice law while the matters were still pending. Kennedy was forced to hire another attorney to handle these matters, and Cooksey never returned any of the money or jewelry Kennedy tendered as payment in full.

15

options are virtually unchallengeable.'" *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003) (quoting *Strickland*, 466 U.S. at 690–91).

The second *Strickland* prong, sometimes referred to as the prejudice prong, requires a showing that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88. "Reasonable probability" means a "probability sufficient to undermine confidence in the outcome." *Id.* at 694. *Strickland*'s second prong carries a lower burden of proof than the preponderance of the evidence standard of the first prong. *See id.*; *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990). An appellant need not show that counsel's deficient performance more likely than not altered the outcome of the case. *Milburn v. State*, 15 S.W.3d 267, 269 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Instead, a defendant challenging a guilty or *nolo contendere* plea satisfies the prejudice requirement of *Strickland* by showing a reasonable probability that absent counsel's deficient performance, he would not have pled guilty and would have insisted on going to trial. *Hill*, 474 U.S. at 59.

A failure to make a showing under either prong defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003). The *Strickland* test "requires a case-by-case examination of the evidence." *Williams v. Taylor*, 529 U.S. 362, 391 (2000).

Cooksey made his claims of ineffective assistance of counsel in a motion for new trial. We review the trial court's denial of Cooksey's motion for new trial on the ground of ineffective assistance for an abuse of discretion, reversing only if the trial judge's opinion was clearly

16

erroneous and arbitrary. *Riley*, 378 S.W.3d at 457. A trial court abuses its discretion if no reasonable view of the record could support the trial court's ruling. *Id.* This deferential review requires us to view the evidence in the light most favorable to the trial court's ruling. *Id.* We may not substitute our own judgment for that of the trial court and must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Id.* "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

(a)    *Ineffective Assistance of Counsel Was Not Shown in the Plea Process*

Cooksey was entitled to effective assistance of counsel during the plea process. *See Ex parte Battle*, 817 S.W.2d 81, 83 (Tex. Crim. App. 1991) (en banc); *Hart v. State*, 314 S.W.3d 37, 40 (Tex. App.—Texarkana 2010, no pet.). "The constitutional validity of a guilty plea made on the advice of counsel depends on whether counsel's performance was reasonably competent, rendering a defendant effective representation during the particular proceedings." *Battle*, 817 S.W.2d at 83.

At the hearing on the motion for new trial, Cooksey testified that he entered pleas of guilty or *nolo contendere* based on his counsels' advice and now regretted following their advice. Cooksey claimed that Shumaker and Williams advised him that guilty or *nolo contendere* pleas would not harm him because the trial court had already made up its mind about punishment. Cooksey testified that his attorneys discussed whether, to affect the punishment outcome, Cooksey should accept responsibility for the offenses. Cooksey explained, "I decided that I was going to take my attorney[s'] advice. I wasn't going to try the case myself. I was

17

going to take [their] advice. I didn't defend myself . . . I don't think I should be held to any greater standard than any other defendant just because of my experience." Cooksey further told the trial court that, in hindsight, it appeared that Shumaker and Williams instructed him to plead guilty because they did not want to lose such a "high profile" case and because they could easily justify the loss to the public by pointing to Cooksey's pleas. At the hearing on the motion for new trial, Cooksey reasserted his previously abandoned claims of innocence to most, though not all, of the charges against him.

Cooksey also clarified, however, that no promises of a more lenient punishment were made to him and agreed that his changed pleas prevented the State from arguing that Cooksey was blaming others for what happened to his clients. He further agreed that the turning point in the trial—the event that led his attorneys to raise the issue of changing pleas—was Hickson's testimony.[12]

Cooksey acknowledged his extensive history as a criminal defense attorney and conceded that he knew at the time he changed his pleas that the State was not required to present testimony in support of an allegation after a defendant's plea of guilty or *nolo contendere*. Cooksey admitted that the State went through the plea papers with him, that he signed them, and that his signature represented his acknowledgment that he (1) fully understood the charges against him, (2) was freely, intelligently, and voluntarily waiving his confrontation rights, (3) understood the consequences of his pleas, and (4) was pleading guilty for the sole reason that he was guilty of

---

[12]Hickson's testimony showed that Cooksey forged Hickson's signature on a $50,000.00 settlement check, cashed the check, and kept the money without even letting Hickson know that his case had been settled.

the offenses. The plea papers also stated, "I am satisfied with the representation of my attorney[s]. [They] provided fully-effective and competent representation for me." Cooksey stated that he alone determined the paragraphs to which he would plead guilty as well as the paragraphs to which he would plead *nolo contendere*. Cooksey claimed that, at the time the changed pleas were heard and accepted by the trial court, he wanted to plead either guilty or *nolo contendere* to all parts of the State's indictment based on counsel's advice.

Shumaker's testimony explained the trial strategy employed, clarified Cooksey's role in the decision-making process, and also demonstrated that Cooksey's plea was voluntary. Shumaker testified that he provided Cooksey with all of the discovery that the State had provided to him and instructed Cooksey to review it. Shumaker and Cooksey then discussed each and every allegation contained in the State's indictment before the trial began. They developed a defensive theory that the State could not prove that Cooksey intended to deceive his former clients at the time he took their money because Cooksey's partial performance transformed the State's theft allegations into mere breach of contract cases.[13] However, this theory of the case

---

[13]"[U]nder the terms of [a contract,] individuals typically have the right to 'deprive the owner of property,' albeit in return for consideration." *Higginbotham v. State*, 356 S.W.3d 584, 588 (Tex. App.—Texarkana 2011, pet. ref'd) (quoting *Baker v. State*, 986 S.W.2d 271, 274 (Tex. App.—Texarkana 1998, pet. ref'd)). Accordingly, the mere failure to perform a contract or the failure "'to return or pay back money after failing to perform a contract, for the performance of which the money was paid in advance'" is not sufficient to establish guilt of theft. *Phillips v. State*, 640 S.W.2d 293, 294 (Tex. Crim. App. [Panel Op.] 1982); *Higginbotham*, 356 S.W.3d at 588 (citing *Phares v. State*, 301 S.W.3d 348, 352 (Tex. App.—Beaumont 2009, pet. ref'd) (quoting *Cox v. State*, 658 S.W.2d 668, 671 (Tex. App.—Dallas 1983, pet. ref'd)).

"[W]hat separates lawful acquisitive conduct from theft is knowledge of a crucial 'circumstance surrounding the conduct'—that the acquisition is 'without the owner's consent.'" *Higginbotham*, 356 S.W.3d at 588 (quoting *McClain v. State*, 687 S.W.2d 350, 354 (Tex. Crim. App. 1985)). Thus, claims of theft in connection with contracts "require[] proof of more than an intent to deprive the owner[s] of property and subsequent appropriation of the property. . . . The State must prove that the appropriation was a result of false pretext, or fraud." *Wirth v. State*, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012). Consequently, the focus in a theft case in connection with a contract is whether the deprivation was made with criminal intent, which can be formed after the parties' entry into the contract. *Higginbotham*, 356 S.W.3d at 588.

19

began to unravel as Rita, Talley, Elliott, Ashcraft, Ligon, Holt, Ray, and Durham unveiled Cooksey's professional tragedy, and as Cooksey's former clients, Harris, Irvin, Autry, Keeth, Higgins, Willborn, Fuller, Marshall, and Hickson testified against him.

Shumaker agreed that the turning point in the trial was when Hickson testified, and that they advised Cooksey to enter pleas of guilty or *nolo contendere* after Hickson's testimony because it appeared that the State would be able to prove criminal intent. According to Shumaker, Hickson's testimony, coupled with all of the documentary evidence provided, the testimony that had already been taken, and the likely testimony of witnesses who were subpoenaed by the State, led to the conclusion that the State would be able to prove its case. Shumaker and Williams believed it would be better for Cooksey to accept responsibility and seek the mercy of the court because they thought that the evidence presented before the pleas already demonstrated criminal intent and was sufficient to convict Cooksey on part of the State's indictment.

Cooksey's wish was to be placed on community supervision. Before the plea, Shumaker and Williams attempted to continue plea negotiations with the State. Their attempt was unsuccessful because the State wanted Cooksey jailed.

At that point, Shumaker and Williams weighed whether to recommend to Cooksey to enter an open plea. Shumaker testified that he and Williams discussed each count with Cooksey, advised him on each count, and left the decision with Cooksey on whether to plead and how to plead. Shumaker stated, "Everything in this case was [Cooksey's] decision. Some things we gave him our advise [sic] on, but we let him ultimately make the decision." He added,

20

"[Cooksey] has been a trial lawyer for 30 something years, and I don't think there is any doubt he fully understood the plea of guilty, the plea of no contest, and what his rights were." Shumaker denied telling Cooksey that the judge had already made up his mind on punishment or that the plea would not harm him. Shumaker claimed that Cooksey did not have a meritorious defense to the parts of the indictment that he pled *nolo contendere* to, that Cooksey never continued to claim that he was not guilty, and that Cooksey never asked to withdraw his guilty/*nolo contendere* pleas even though he knew that was an option. Before sentencing, Cooksey told the trial judge,

> If the death sentence were possible and it would take away all these peoples' pain and repair the damage, I would say give it to me.
>
> I accept responsibility for the total mess that my office was and for all the pain and the heartache and the loss and damages that these people have incurred. My office: My responsibility.

In addition to the arguments presented at the hearing on the motion for new trial and the parties' arguments on appeal, this Court has discovered another reason why counsel could have recommended that Cooksey enter pleas of guilty/*nolo contendere*. At trial, Williams urged the court to give Cooksey deferred adjudication on Count 1 of the State's indictment. Since Cooksey had never previously been convicted of a felony and the court waited until after closing arguments to find Cooksey guilty of any offense, judge-ordered deferred adjudication community supervision was an option for the court to consider. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 5 (West Supp. 2013). In this circumstance, Cooksey would be eligible for

21

deferred adjudication community supervision only if he pled guilty or *nolo contendere. See* TEX. CODE CRIM. PROC. ANN. art. 42.12, §§ 3, 5 (West Supp. 2013).[14]

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Shumaker and Williams reviewed all of the documentary evidence in the State's possession and sat through more than two days of damning testimony from several of the State's witnesses. They were aware that their client wanted deferred adjudication community supervision on Count 1 and regular community supervision on the remaining counts. Counsels' attempts to negotiate a plea agreement with the State had failed because the State would not agree to recommend community supervision. The testimony at trial indicated that their strategy on guilt/innocence—that Cooksey's shortcomings constituted breaches of contract giving rise only to civil liability—would likely be unsuccessful because it appeared that the State would be able to prove criminal intent. Armed with this knowledge, Shumaker and Williams advised Cooksey to take responsibility and plead guilty or *nolo contendere* so that the trial court could consider deferred adjudication community supervision as an option under Count 1 and might be more willing to consider Cooksey's request for community supervision on the remaining counts.

In denying the motion for new trial, the trial court could find that Shumaker's and Williams' advice with regard to Cooksey's pleas constituted "strategic choices made after thorough investigation of law and facts relevant to plausible options." *See Wiggins*, 539 U.S. at

---

[14]Williams argued that the trial court could find Cooksey guilty on Counts 2-6, but could suspend the sentence. While deferred adjudication is only available after a plea of guilty or *nolo contendere*, regular community supervision can be imposed by the trial court after either a plea or a finding of guilt after trial. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, §§ 3, 5.

521–22; *Nicholas v. State*, 56 S.W.3d 760, 771 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) ("A plea is not rendered involuntary simply because the defendant did not receive the punishment he hoped for, even if his expectation was the result of something the defendant claims his lawyer told him."); *see Muzoz v. State*, No. 02-10-00129-CR, 2011 WL 1833140, at *7 (Tex. App.—Fort Worth May 12, 2011, no pet.) (mem. op., not designated for publication)[15] (to get deferred adjudication community supervision, defendant had to enter open plea). Because the court could determine that counsels' actions were within the wide range of reasonable professional assistance, Cooksey failed to meet the first *Strickland* prong. *See Wiggins*, 539 U.S. at 521–22; *Hill v. Lockhart*, 474 U.S. 52, 56–57 (1985).

> Moreover, in the context of a guilty plea,
>
> The second [*Strickland*], or "prejudice," requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

*Hill*, 474 U.S. at 59. Cooksey points to evidence and testimony from the motion for new trial hearing that would have supported his claim that he was not guilty of the allegations in certain paragraphs of the State's indictment. However, we are only concerned at this point with whether he would have decided against his pleas. *See Prudhomme v. State*, 47 S.W.3d 683, 692 (Tex. App.—Texarkana 2001, pet. ref'd).

---

[15]Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

Cooksey testified that, absent counsel's advice, he would not have pled guilty/*nolo contendere*. However, the trial court was free to disbelieve Cooksey's testimony at hearing, especially since he asked for deferred adjudication on Count 1, which required a plea of guilty/*nolo contendere*, and was hoping that the plea on the remaining counts would curry favor with the court so that his request for community supervision on those counts would be favorably received. *See Riley*, 378 S.W.3d at 457. Cooksey has not met the second prong of the *Strickland* test.

Given that Cooksey's complaint of ineffective assistance was raised in a motion for new trial, we review the evidence in a light most favorable to the trial court's ruling. Based on this record, which shows that Cooksey failed to make either required showing under *Strickland*, we cannot say that the trial court's decision to overrule his motion for new trial complaining of ineffective assistance during the plea process was clearly erroneous and arbitrary. *Id.*

(b)     *Ineffective Assistance of Counsel Was Not Shown in How Cooksey's Attorneys Accepted Defense Guidance from Cooksey*

Cooksey also argues that his trial attorneys were ineffective because they did not allow him sufficient input into his defense. Cooksey complained during the hearing on the motion for new trial that Shumaker and Williams were ineffective in developing a theme for the case and in adopting the State's case that Cooksey had an addiction to gambling and alcohol. Cooksey believed that the defense should have adopted the theme that someone else, such as former secretaries Hughes, Christina Martin, and Conaway,[16] were responsible for the offenses.

---

[16]Martin and Conaway did not testify at trial.

24

Because counsel failed to present this evidence, Cooksey now argues that he was prevented from participating in the development of the core trial strategy. He believes that this conduct constituted ineffective assistance and that he was harmed because had the evidence been presented, in large part through his own testimony, the State would not be able to prove all of the allegations in the complaint.[17]

Cooksey testified that his secretaries, some of whom were known felons Cooksey felt deserved a second chance, were responsible for writing checks, handling the bills, and making deposits. He told the court that his secretaries had stolen from him and were kiting checks. In particular, Cooksey testified that Hughes and Conaway used his signature stamp to endorse checks and took actions of which he was unaware. Cooksey told the judge that he caught Hughes and Conaway stealing $35,000.00 and that Martin had stolen $50,000.00 to $75,000.00 from him.[18] Cooksey claimed that his testimony was not presented because Shumaker and Williams advised him not to testify or present this evidence. To substantiate his claims, Cooksey introduced pleadings in various cases that he had filed against his secretaries.[19]

---

[17]Cooksey told the court that he did not testify on his own behalf because he relied on Shumaker's and Williams' advise not to do so.

[18]Cooksey testified that Martin had filled out an affidavit admitting that she had stolen $25,000.00.

[19]Cooksey also complained that counsel (1) took a less aggressive stance toward the end of trial, (2) allowed the State to lead its witnesses, (3) failed to cross-examine Rita, who would have testified that every client received money owed to them, (4) hung their heads after the pleas and lost the battle of "courtroom dynamics," and (5) failed to call certain witnesses." Shumaker testified that he and Williams were aggressive and fought throughout the trial, that they only objected to leading questions when the question was designed to put words into the witnesses' mouths, and that they did not cross-examine some witnesses because they had nothing to ask them.
Shumaker stated that the defense had a complete list of the State's witnesses, but that the State agreed not to call certain witnesses after the plea to shorten the process. Cooksey also raised alleged inconsistences at trial, including,

25

Shumaker testified that they had, in fact, considered employing the strategy that the legal secretaries were responsible for the acts. However, Shumaker stated that they could not find evidence to support Cooksey's claims and that the testimony at trial from several victims, combined with evidence of Cooksey's gambling addiction, the results of the State Bar investigations, and Cooksey's voluntary relinquishment of his licenses, led to the decision to abandon this strategy. Instead, in light of the fact that Cooksey wanted deferred adjudication community supervision on Count 1 and regular community supervision on Count 2, Shumaker

---

- Higgins testified she signed the checks, so there was no forgery. However, Higgins testified that she did not sign the third check for $2,503.00.
- Fuller was not the victim of the crime, the corporation was the victim since the escrow account was held in the corporation's name. However, as a shareholder, Fuller had a greater right of possession to the funds as compared with Cooksey.
- Willborn's money was not taken by Cooksey, it was stolen by someone else. However, Willborn paid in cash, and Cooksey's secretaries testified that they would give cash payments to Cooksey.
- He did not begin working on Kirby's cases because he did not receive the criminal file in a timely manner. However, Kirby's parole officer testified Cooksey never called her to discuss the case despite being asked to do so.
- He worked some on Black's case and appeared at a hearing. However, Cooksey lost his license before the representation terminated and did not refund Black's money.
- He filed an answer and a motion for new trial in Green's case. However, the motion was filed after Cooksey's failure to appear at the final hearing resulted in Green's loss of managing conservatorship of her child.
- He could no longer appear in Kennedy's case because he lost his license.
- He filed papers in Henry's custody case. However, Cooksey lost his license to practice law shortly thereafter.
- He handled Marshall's case. However, Elliott testified that Cooksey never called him, Marshall testified that the case kept getting reset because Cooksey would not appear at hearings, and eventually Cooksey lost his license.
- He handled Kramer's case before he lost his license. However, Cooksey failed to respond to discovery, would not get in touch with her, and did not refund any retainer after he lost his license.
- The State could not prove the paragraph naming Hickson as a victim because Hickson had received a check. However, the evidence at trial showed that, while Hickson received one check, Cooksey never disclosed receipt of another $50,000.00 settlement check.
- He did not forge Harris' signature, he just endorsed the check with his name. The copy of the check shows a handwritten signature purporting to be Harris' signature beside Cooksey's signature.
- He visited Little's son in jail and appeared in court at least once. Little did not testify at trial.
- Martin had appropriated Irwin's check.

26

advised Cooksey to enter pleas of guilty/*nolo contendere*, and Cooksey took his advice. Thus, they adopted the concept of acceptance of responsibility as the core trial strategy.

Even after entering his pleas of guilty and *nolo contendere*, Cooksey claimed that he desired to present his own testimony and evidence allegedly demonstrating his secretaries' involvement in, and partial responsibility for, several of the offenses contained in the State's indictment. Shumaker testified a "major point of contention [was] that he wanted to keep blaming the secretaries after he pled guilty." Shumaker believed that the entire point of pleading guilty/*nolo contendere* was to take responsibility, and he advised Cooksey not to testify because he believed (1) that Cooksey would be subject to cross-examination that would be damning to him, (2) that Cooksey would contradict his pleas by suggesting he was not responsible for the offenses, and (3) that the trial court might look more favorably at a lighter punishment if Cooksey accepted responsibility. In the end, Shumaker said that Cooksey decided not to testify.[20]

Based on Shumaker's testimony, the trial court was free to determine that Cooksey was not excluded from participating in the development of a core trial strategy.[21] Shumaker testified, "We would give [Cooksey] advice on something, and he would express his concern about it, and then he made the decision on whether he wanted to follow our advice or not." Before the hearing on the motion for new trial, the trial judge stated,

---

[20]Shumaker also stated that Cooksey never asked to subpoena Martin or Conaway and that he would have issued subpoenas if Cooksey had asked him to.

[21]Citing to cases discussing hybrid representation, the State argues that Cooksey did not have a constitutional right to control the strategic decisions of trial counsel. Cooksey stated on the record that he was not seeking to represent himself. We do not find the cited cases applicable to Cooksey's case.

27

During the course of the trial, as you will recall, although his current lawyer might not remember it, but Mr. Cooksey was very animated and held many discussions with his counsel, his trial counsel at that time, so I mean it's not as if he's just a victim out here, left to the caprices of the legal system. He has been a part of the legal system for many years and certainly knows what's going on . . . .

At the hearing, Cooksey consistently stated that he accepted the advice of counsel, and there was no suggestion that he was coerced to do so. The trial court's denial of the motion for new trial indicated its belief that Cooksey had voluntarily agreed to employ a trial strategy that would better his chances for deferred adjudication and regular community supervision and that he had voluntarily agreed to counsels' advice not to testify or present evidence that his secretaries were responsible for the offenses.

Moreover, we previously found that counsel's advice during the plea proceedings constituted reasonable trial strategy. In order to show ineffective assistance in Shumaker and Williams' decision to advise Cooksey against testifying and to refrain from suggesting that the legal secretaries were responsible for the offenses, Cooksey was required to rebut, by a preponderance of the evidence, the strong presumption that this advice constituted sound trial strategy.[22] Yet, some evidence pertaining to Cooksey's claims had been developed at trial and did not favor his arguments.

Talley remembered Cooksey telling her that he suspected that some of his secretaries were stealing from him. Durham, who had worked for Cooksey from 2005 until 2008, testified that she did not steal from Cooksey and did not see anyone else stealing from him. Ferguson

---

[22]In determining whether counsel was ineffective, we consider the totality of the circumstances of the particular case. *Thompson*, 9 S.W.3d at 813.

28

also testified that she did not see the staff doing anything illegal. Hughes denied Cooksey's allegations outright. She testified that she never took any money from settlement checks, that she made deposits as requested when needed, and that Cooksey would personally come to the office when a client made a payment. Hughes stated that Cooksey instructed her to float expenses and to take money out of the "Texas Equal Access to Justice Foundation" account. Johnson testified that Cooksey had to use her personal account to cash Cooksey's checks because his bank accounts were frozen.

Commercial National Banks' Ann Davis testified that Cooksey knew that his secretaries were using stamp endorsements to deposit Cooksey's checks and that the stamp endorsements were authorized by him. Davis also testified that Cooksey was aware that the "Texas Equal Access to Justice Foundation" account was overdrawn and that he never claimed it was due to theft by his secretaries.

Cooksey's law partner from 1991 until 2004, Kaylin Kluge, testified at the hearing on the motion for new trial that Cooksey had also told her that he suspected the secretaries of stealing money. Kluge told the trial court that she had never seen any evidence of theft from the secretaries while she practiced with Cooksey. She clarified, "The reference that I had was that some money was missing out of the trust account and he thought that that secretary may have taken the money out, perhaps mistakenly to pay bills or something that should have come out of the operating account."

Cooksey accused Hughes of theft, which she denied outright. He was also blaming two other secretaries who did not testify, could have potentially been called by the State, and could

have potentially discredited Cooksey's claims and further harmed his case. As for Cooksey's introduced pleadings filed against former secretaries, the trial court reminded Cooksey that pleadings are not evidence.

Evidence established that Cooksey had previously threatened his secretaries with criminal proceedings, and he was not always truthful in his pleadings to the court. At trial, Johnson testified that Cooksey would not provide her with a W-2 tax form after she resigned. As a result of her requesting this information, Cooksey threatened to file criminal charges against her for harassment. When she left Cooksey's law firm, Cooksey owed her $5,000.00 as a result of her using her personal account to take care of the firm's business. Cooksey never paid her. Instead, Cooksey claimed Johnson as a debtor in bankruptcy and provided the bankruptcy court with a bad address for Johnson even though he knew where she lived. Johnson never discovered that she was claimed as a debtor, and the bankruptcy court discharged the debt.

Judge Miller testified that Cooksey had provided untruthful responses concerning cases in Miller's court in answering some of the State Bar of Texas' interrogatories. Attorney David James testified at the hearing on the motion for new trial that he represented Rusty Cranford in a case filed against Cranford and Martin by Cooksey, who claimed he was owed $4,000.00. James testified that his client always denied that any money was owed to Cooksey.

The trial court could have found that Shumaker and Williams' advice to Cooksey to remain silent instead of offering self-serving testimony was based on their belief that he would

have made a poor witness or would have been subjected to damning cross-examination.[23] Shumaker and Williams could have decided to limit the State's opportunity to impeach Cooksey. Also, it is possible that the State would have used the opportunity to bring additional witnesses, including Martin and Conaway, to strengthen its case. The decision to recommend that a defendant not testify at his trial can be considered reasonable trial strategy. *Lucious v. State*, 828 S.W.2d 118, 123 (Tex. App.—Houston [14th Dist.] 1992, no pet.). We cannot say, based on the record here, that the trial court abused its discretion in concluding that the decision to recommend that Cooksey remain silent was a sound one.

Likewise, that court was free to conclude that failure to present testimony about the secretaries' involvement was based in legitimate trial strategy. A fear of Cooksey's impeachment, introduction of additional damning evidence against him, and the possibility that he could harm his chances of receiving deferred adjudication and regular community supervision could have led Shumaker and Williams to advise Cooksey not to raise evidence of the secretaries' involvement. Therefore, because Cooksey could not meet the first *Strickland* prong, we find that the trial court did not abuse its discretion in denying Cooksey's motion for new trial premised on allegations of ineffective assistance of counsel.[24]

---

[23]*See Baylor v. State*, No. 06-12-00035-CR, 2012 WL 4841601, at *8 (Tex. App.—Texarkana Oct. 11, 2012, pet. ref'd) (mem. op., not designated for publication).

[24]Cooksey was also required to show how he was harmed by counsels' decision in advising him not to testify and in failing to introduce what Cooksey believed was mitigating evidence. The trial court could have determined, in light of Cooksey's pleas and the trial strategy of accepting responsibility, that Cooksey could not meet the *Strickland* prejudice prong.

Before the close of Cooksey's case, Cooksey engaged in this discussion with Shumaker on the record:

> [Defense Counsel]: Your Honor, that's the last witness we are going to call. We just need to get Mr. Cooksey to acknowledge a couple of things with us.
>
> THE COURT: Go ahead. You can do it from there.
>
> [Defense Counsel]: [Cooksey], you have been in this through the course of the trial. Is that correct?
>
> [Defendant]: Yes.
>
> [Defense Counsel]: And have we presented everything you wanted us to present in the majority of the case?
>
> [Defendant]: Yes.
>
> [Defense Counsel]: And at this time, we talked to you about the pros and cons if you take the witness stand and testify, and we have given you our advice and our opinion, and have you decided not to testify based on what we have talked about.
>
> [Defendant]: Yes, on your advice.
>
> [Defense Attorney]: That's all. With that, we rest.

Ineffective assistance of counsel has not been shown.

*(3)    Cooksey's Pleas Were Knowing, Intelligent, and Voluntary*

"No plea of guilty or plea of nolo contendere shall be accepted by the court unless it appears that . . . the plea is free and voluntary." TEX. CODE CRIM. PROC. ANN. art. 26.13(b) (West Supp. 2013). "'A plea of guilty is not knowingly and voluntarily entered if it is made as a result of ineffective assistance of counsel.'" *Hart*, 314 S.W.3d at 40 (quoting *Ex parte Burns*,

601 S.W.2d 370, 372 (Tex. Crim. App. 1980)) (citing *Ex parte Karlson*, 282 S.W.3d 118, 129

(Tex. App.—Fort Worth  2009, pet. ref'd)).

Cooksey decided to plead guilty or *nolo contendere* to all counts in the State's

indictment, as follows:

> THE COURT:        Resumption of 1250377 in the 5th District Court, Bowie County, Texas, The State of Texas versus Don Clayton Cooksey.
>
> Mr. Cooksey, it appears that from the documents in front of me at this time, that after consulting with your lawyer, that -- as to the various counts in the indictment, that you intend to enter -- to change your plea.
>
> I need to -- and as to some counts, apparently, according to this, you -- the documents I'm looking at, is there will be a plea of guilty to some, a plea of no contest to others.[25]
>
> Now, although I know that -- at least according to the evidence, that you've been a lawyer for many years and have a great deal of experience in the criminal courts of this state, I would remind you that since there is no deal as to what would be the actual outcome in the case, that is to say, sentence, you need to be reminded that the Court has the authority, . . . if I accept the change of plea, that you would be subject to any of the punishment alternatives that exist, as I told you when you were arraigned back on the 6th -- apparently on June the 28th of last year.
>
> Do you recall that?
>
> [Defendant]:   I do.
>
> THE COURT:  Do you also understand that although the -- if you choose to do so and as to some of these counts enter a no contest plea, a no contest plea, as you well know, would be treated by a criminal court as equivalent and actually the same and identical to a guilty plea.

---

[25]The documentation presented to the trial court informed it that Cooksey was pleading guilty to paragraphs 4, 8, 9, 11, 19, and 20 in Count 1 of the State's indictment and paragraphs 1–6 in Count 2.  The documentation also showed that Cooksey was pleading *nolo contendere* to (1) paragraphs 1–3, 5, 7,10,12–18, 21, and 22–25 in Count 1 of the State's indictment, (2) paragraph 7 of Count 2, and (3) Counts 3–6.  These documents are discussed in detail below. The State abandoned paragraph 6 of Count 1.

The only distinction in Texas law between a no contest plea and a guilty plea would be is that the fact that -- that a no contest plea was entered, and that fact could not be asserted as proof -- as direct evidence in any civil prosecution that might arise out of the -- whatever the subject matter of the case before me now.

Do you understand that?

[Defendant]:   I do.

THE COURT:  And is it your desire to -- to change your plea as to any of these counts?

[Defendant]:   It is, Your Honor.  I've practiced law for 35 years. This was my law office.  I am ultimately responsible for everything that occurred in it.

THE COURT:  Now, do you also understand, Mr. Cooksey, that should I -- should you change your pleas and I accept those pleas, whether they're guilty to some and no contest to others, then that means is that you could reasonably expect that . . . at the end of the proceeding is that you could reasonably expect, and in all likelihood is that I would be finding you guilty and assess some punishment within the range authorized by law?

[Defendant]:   I do.

THE COURT:  Now, because the . . . trial it has multiple counts, multiple dates, multiple alleged victims, . . . if you are sentenced, if you're found guilty and sentenced, then, of course, whatever the highest possible punishment range would be the cap.  But other than that --

[Defendant]:   I do.

THE COURT:  -- there would be affixed to each of the counts and to each of the paragraphs in the indictment a finding?

[Defendant]:   I do.

THE COURT:  Now, as to any of the counts that you would be changing your plea to and which there's not been witnesses who are appearing, because some of the counts, the witnesses named in the indictment have testified and in others they have not testified yet, you would be giving up your right to confrontation and cross-examination?

[Defendant]:    I understand.

THE COURT:    Both you and the State, even if I accept your plea, can continue to offer whatever evidence that they choose to offer?

[Defendant]:    I understand.

THE COURT:    Although, you'll be very quickly finding out whatever the Court's decision would be about accepting the pleas.   And if they are accepted, then under our law, I would caution you that you could not later on, tomorrow or the next day, up and decide that was a bad idea and withdraw or seek to change it.

[Defendant]:    I understand.

THE COURT:    Now, may I assume that during the last hour or so that apparent negotiations have been going on between you -- you, your lawyers and -- and the attorney generals here?

[Defendant]:    You may.

THE COURT:    That there's been cure time and opportunity for you to reflect on the wisdom of this decision?

[Defendant]:    There has been.

Guilty Plea Received

THE COURT:    Are there any other questions whatsoever you might have of your good lawyers here, that have been doing a fine job for you, or of me before I ask you at the point of no return about what your plea is going to be?

[Defendant]:    No questions.

THE COURT:    Okay. Mr. Cooksey, is it still your desire to change -- to withdraw -- to ask leave of the Court to withdraw your plea of not guilty to every count in the indictment and to either enter pleas of guilty to or pleas of -- to some and pleas of no contest to the balance of them all that's reflected in the documents that seemed to be signed by you and your lawyer?

[Defendant]:    It is.

35

. . . .

THE COURT: All right. Leave is granted. The plea of not guilty to this indictment to all counts, save and except paragraph -- Count 1, paragraph 6, which has now been dismissed, the Defendant -- leave is granted to withdraw the not guilty plea and interpose, instead, a plea of guilty to the counts that are enumerated in the document which are signed by the defendant and his counsel of record, and which will now bear the Court's signature.

[Defense Attorney]: That's correct, Judge.

Cooksey was a criminal defense attorney for thirty-five years who was described by local judges as being an excellent advocate. He does not contend that the trial court failed to properly admonish him or that he was unaware of the charges against him or the ranges of punishment involved. It appears that his pleas were intelligently and voluntarily entered.

During the hearing on the motion for new trial, it was shown that Cooksey acquiesced to the pleas based on the advice of his counsel. Cooksey argues that his pleas were involuntary because counsel rendered ineffective assistance in advising him to plead guilty/*nolo contendere.* We addressed Cooksey's claim of ineffective assistance earlier in this opinion. Because Cooksey's pleas appeared to be actually voluntary and because ineffective assistance of counsel has not been shown, we overrule Cooksey's argument that his pleas were involuntary.

*(4)     Sufficient Evidence Supports the Modified Restitution Order*

A sentencing court may order a defendant to pay restitution to the victim of an offense. TEX. CODE CRIM. PROC. ANN. art. 42.037(a) (West Supp. 2013); *Idowu v. State*, 73 S.W.3d 918, 920 n.5 (Tex. Crim. App. 2002). The State must prove, by a preponderance of the evidence, the amount of loss sustained by the victim as a result of the offense. TEX. CODE CRIM. PROC. ANN. art. 42.037(k) (West Supp. 2013). The trial court must resolve any dispute relating to the proper

36

amount or type of restitution. *Id*. However, the amount of restitution ordered (1) must be just

and supported by a factual basis within the loss of the victim, (2) must be for the offense for

which the defendant is criminally responsible, and (3) must be for the victim of the offense for

which the defendant is charged. *See Campbell v. State*, 5 S.W.3d 693, 696–97 (Tex. Crim. App.

1999); *Cantrell v. State*, 75 S.W.3d 503, 512 (Tex. App.—Texarkana 2002, pet. ref'd).

The trial court's judgment initially recited a restitution order of $245,723.00, which

Cooksey challenged. We reviewed Cooksey's challenge to the restitution order under an abuse

of discretion standard. *See Cantrell*, 75 S.W.3d at 512 (citing *Cartwright v. State*, 605 S.W.2d

287, 288–89 (Tex. Crim. App. [Panel Op.] 1980)). Our reading of the record suggested that the

trial court, the State, and Cooksey relied on a restitution worksheet produced by the State in

discussing the amount of restitution that should be awarded and that the trial court did, in fact,

rely on the worksheet. Although the State had the intention of offering the worksheet as

evidence, it did not do so. At the hearing on the motion for new trial, the trial judge was

provided with a copy of the restitution worksheet and immediately recognized it.[26] Again, the

worksheet was not included as an exhibit. Despite many attempts at harmonizing the evidence

with the trial court's figure, we were unable to find support for the court's restitution award. We

opined that the discrepancy might lie in the fact that no evidence was presented of Conaway or

---

[26]At the hearing on Cooksey's motion for new trial, the trial court indicated its intention to enter a judgment nunc pro tunc redacting $10,000.00 from the restitution order after reviewing the restitution worksheet and claim for restitution made by the State Bar of Texas.

37

Little's damages.[27]   Therefore, we concluded that the evidence did not support the court's restitution order.

When there is insufficient evidence to support the amount of restitution ordered by the trial court, the proper procedure is to abate the appeal, set aside the amount of restitution, and remand the case for a hearing to determine a just amount of restitution. *See Barton v. State*, 21 S.W.3d 287, 290 (Tex. Crim. App. 2000). On March 25, 2014, we abated the appeal and ordered the trial court to make a determination of the just amount of restitution.[28]   As a result of the restitution hearing, in which the restitution worksheet was admitted, the trial court determined that a total of $203,419.00 would fairly compensate the victims of the offense.[29]   This amount of total restitution is supported by the record.

Cooksey agreed, and we have confirmed, that the record is sufficient to establish restitution amounts with respect to the following victims:  Black, $11,000.00; Boyd, $8,500.00; Campbell, $1,000.00; Cook, $1,000.00; Davidson, $5,000.00; Gibbs, $1,700.00; Harris,

---

[27]The State argued that Johnson testified that Little wrote a check to Cooksey, which the State identified as Exhibit 56.  The check was not introduced into evidence and we, still, cannot determine the amount of the check from the record.

[28]We are also reminded that

> [t]he order of restitution must require the defendant to:  (i) make restitution directly to the person or agency that will accept and forward restitution payments to the victim or other person eligible for restitution under this article, including the compensation to victims of  crime fund; (ii) make restitution directly to the victim or other person eligible for restitution under this article, including the compensation to victims of a crime fund; or (iii) deliver the amount or property due as restitution to a community supervision and corrections department for transfer to the victim or person.

TEX. CODE CRIM. PROC. ANN. art. 42.037(g)(4) (West Supp. 2013).

[29]The trial court's order also specified the amounts that were to be paid to each victim, the State Bar, and lienholders.

$4,500.00; Kennedy, $10,000.00; Autry, $7,500.00;[30] Martin, $3,000.00; Rodden, $2,500.00; Willborn, $2,381.00; Henry, $7,000; Marshall, $2,500.00. Therefore, $67,581.00 of the restitution amount is uncontested.

Cooksey characterized the restitution amounts attributed to Kramer, Keeth, and Fuller as uncontested. However, with respect to these victims, the record supports an award greater than the amounts suggested by Cooksey in his briefing. Cooksey argues that the record supports only a $1,500.00 restitution award to Kramer. Although this was the amount of the initial retainer quoted by Cooksey, Kramer testified that she paid him an additional $1,666.67, bringing the total paid to $3,166.67. Cooksey also claims that the record only supports a $2,000.00 restitution award to Keeth. However, the State's indictment named both Keeth and her daughter Stanley, and Stanley testified that she paid Cooksey an additional $1,000.00. Also, due to Cooksey's failure to handle the matter, the trial court assessed $3,500.00 in attorney's fees against Keeth, which Cooksey promised to pay, but never did. Thus, the record supports a $6,500.00 restitution award to Keeth. With respect to Fuller, Cooksey suggests that the escrow account balance of $13,470.00 was the only evidence supporting a restitution award to Fuller, but that argument ignores the fact that Cooksey took an additional $10,000.00 from the escrow account that has yet to be accounted for.[31] The evidence supported a $23,470.00 restitution award to Fuller. Also, the record shows that King paid Cooksey $250.00[32] and that Green paid Cooksey $2,250.00. At

---

[30]Cooksey's concession to this amount was contingent on our finding that he failed to perform legal services in both the possession and parole cases Autry hired Cooksey to handle.

[31]Cooksey's brief later acknowledges $28,470.00 as the maximum possible restitution amount.

the restitution hearing, Conaway testified she hired Cooksey to represent her on a variety of criminal matters and that he owed her $10,000.00. Adding all of these amounts to the uncontested amount yields an award of $113,217.67, thus far.

Cooksey's main argument before the restitution hearing involved the amount of restitution in Hickson's, Irvin's, and Higgins' cases. Cooksey argued that the restitution amount in these cases should be reduced by the contingency fee he was supposed to receive if these cases settled. On remand, the State made the following concessions during the restitution hearing:

> In an abundance of caution, . . . I don't necessarily believe him to be entitled to it, but as the State feels that the defendant in this case, having pled, having been a criminal defense attorney, and having wasted countless money of Bowie County taxpayer money on this issue, in an abundance of caution, we would reduce the amount of Lonnie Hickson from the $50,000 to $33,333 for attorneys' fees, and also in Patricia Higgins, we would subtract out the amount [of attorney's fees]. Mr. Cooksey could make a claim that could continue to wind its way through the courts that he is due attorneys' fees of a third for Lonnie Hickson's settlement and a third for Patricia Higgins' settlement.

However, the State argued that Cooksey was not entitled to any attorneys' fees on Irvin's case because Cooksey had been fired before he settled the case.

The trial court agreed with Cooksey's argument at the restitution hearing and subtracted the allegedly earned contingency fee[33] from the original settlement amounts in all of these

---

[32]Cooksey argues that, while the indictment named Linda King as a victim, the witness' name at trial was Mindy King. Thus, Cooksey argues, the evidence is insufficient to support the restitution awarded to Linda King. However, Cooksey pled no contest to the offense as alleged in the indictment, and the evidence demonstrates that the State Bar of Texas compensated Linda King for the same amount of restitution claimed by Mindy King at trial. Therefore, the evidence was sufficient to support the trial court's restitution award to Linda King.

[33]Although the record shows that Irvin only agreed to a twenty-five percent contingency fee, the trial court subtracted a one-third contingency fee from the total amount of restitution owed to Irvin.

40

cases.[34] Due to the State's concessions, we need only address the issue of attorneys' fees as it relates to Irvin's case. Cooksey settled Irvin's case without his knowledge or consent after Irvin had already fired Cooksey. A lawyer is merely a representative of his client and cannot accept an offer of settlement except as otherwise authorized by law. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.02(a)(2). Settling without a client's consent can lead to criminal liability. *Capps v. State*, 265 S.W.3d 44, 47–48, 50, 52 (Tex. App.—Houston [1st Dist.] 2008), pet. ref'd); *see* TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08(E). Because Cooksey's representation had already been terminated, Cooksey was not entitled to settle Irvin's case, and the fact that he did so without Irvin's consent leads us to conclude that Cooksey was not entitled to any attorney's fees from the settlement. Therefore, Cooksey's restitution to Irvin should be in the amount of $25,000.00. Adding this amount to the $33,350.00 Cooksey was ordered to pay in Hickson's case, and the $35,179.00 Cooksey was ordered to pay in Higgins' case to the $113,217.67 already established by the record yields a figure of $206,746.67, a figure slightly greater than the trial court's modified restitution order.[35]

The evidence is sufficient to support the trial court's modified restitution order.

*(5)     The Judgments Should Be Modified to Accurately Reflect Cooksey's Pleas and Convictions*

Cooksey argues that the trial court's judgments incorrectly reflect that he pled guilty to all of the offenses and paragraphs in the State's indictment. The Texas Rules of Appellate

---

[34]We note that Hickson's and Higgins' client "retainer agreements" mandated that their consent "must be secured before any final settlement is made." "If no recovery is obtained, no attorney's fees shall be payable."

41

Procedure give this Court authority to modify judgments and correct typographical errors to make the record speak the truth. TEX. R. APP. P. 43.2; *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). The State concedes the error and acknowledges that the judgments should be modified.

Accordingly, we modify the judgments as set forth in Tables A–C, attached hereto and incorporated herein for all purposes, to properly reflect Cooksey's pleas to the various paragraphs of the various charges.

Additionally, further modification to the judgment regarding the theft charge is required. Theft in an amount greater than $100,000.00 but less than $200,000.00 is a second degree felony, while theft in an amount greater than $200,000.00 is a first degree felony. *See* TEX. PENAL CODE ANN. § 31.03(e)(6)–(7) (West Supp. 2013). The State's indictment states that Cooksey appropriated "$100,000 or more but less than $200,000," but the statement is made beside the notation "(1st degree felony)." The body of the indictment alleges that the "aggregate value of the property obtained was $200,000 or more." Cooksey's plea papers also refer to the indictment and contain the incorrect notation that theft of property ">100,000k <$200,000k" is a first degree felony. However, Cooksey pled guilty or *nolo contendere* to the theft indictment, paragraph by paragraph, the indictment referenced that it was charging a first degree felony, the plea papers and punishment admonishments refer to the theft count as a first degree felony, and Cooksey

---

[35]Little did not testify at trial. The State cites to Johnson's testimony that Little wrote a check to Cooksey which the State identified as Exhibit 56. The check was not introduced into evidence, and we cannot otherwise determine the amount of the check.

42

does not contest that his conviction under Count 1 was anything other than a first degree felony offense. Yet, the judgment classifies, "Theft of property >100,000k <$200,000k" as a first degree felony. Therefore, we further modify the trial court's judgment by changing the description of the offense from "Theft of property>100,000k <$200,000k" to "theft of property with an aggregated value greater than $200,000.00."

We affirm the trial court's judgment as modified.


Josh R. Morriss, III
Chief Justice


Date Submitted:     April 22, 2014
Date Decided:       July 9, 2014

Do Not Publish

43

**Tables of Charges and Pleas**
Cooksey v. State, 06-13-00096-CR

*Table A*

| COUNT 1: THEFT *(Judgment at Supplemental Clerk's Record, Volume 1, Pages 14–16)* | | | | | |
|---|---|---|---|---|---|
| PARAGRAPH | VICTIM | MODIFIED PLEA | PARAGRAPH | VICTIM | MODIFIED PLEA |
| 1 | Black | Nolo contendere | 14 | King | Nolo contendere |
| 2 | Boyd | Nolo contendere | 15 | Autry | Nolo contendere |
| 3 | Campbell | Nolo contendere | 16 | Kramer | Nolo contendere |
| 4 | Cooks | Guilty | 17 | Martin | Nolo contendere |
| 5 | Davidson | Nolo contendere | 18 | Rodden | Nolo contendere |
| 6 | Wagner | N/A [Dismissed] | 19 | Keeth | Guilty |
| 7 | Gibbs | Nolo contendere | 20 | Higgins | Guilty |
| 8 | Harris | Guilty | 21 | Willborn | Nolo contendere |
| 9 | Hickson | Guilty | 22 | Fuller | Nolo contendere |
| 10 | Green | Nolo contendere | 23 | Conaway | Nolo contendere |
| 11 | Irvin | Guilty | 24 | Henry | Nolo contendere |
| 12 | Little | Nolo contendere | 25 | Marshall | Nolo contendere |
| 13 | Kennedy | Nolo contendere | | | |

*Table B*

| COUNT 2: MISAPPLICATION *(Judgment at Supplemental Clerk's Record, Volume 1, Pages 17–18)* | | | | | |
|---|---|---|---|---|---|
| PARAGRAPH | VICTIM | MODIFIED PLEA | PARAGRAPH | VICTIM | MODIFIED PLEA |
| 1 | Harris | Guilty | 5 | Willborn | Guilty |
| 2 | Hickson | Guilty | 6 | Fuller | Guilty |
| 3 | Irvin | Guilty | 7 | Conaway | Nolo contendere |
| 4 | Higgins | Guilty | | | |

*Table C*

| COUNTS 3–6: FORGERY *(Judgments at Supplemental Clerk's Record, Volume 1, Pages 19–26)* | | | | | |
|---|---|---|---|---|---|
| COUNT | VICTIM | MODIFIED PLEA | COUNT | VICTIM | MODIFIED PLEA |
| 3 | Harris | Nolo contendere | 5 | Hickson | Nolo contendere |
| 4 | Harris | Nolo contendere | 6 | Higgins | Nolo contendere |